**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

JOEY TAYLOR                                                                                        PLAINTIFF

v.                                       NO. 4:05CV01314 JLH

SBC COMMUNICATIONS, INC., SBC MEDICAL
ABSENCE & ACCOMMODATIONS RESOURCE
TEAM, SBC DISABILITY INCOME PLAN                                                    DEFENDANTS

**OPINION**

Joey Taylor filed this complaint pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq., alleging that his long-term disability (LTD) benefits were wrongfully terminated and that defendants breached their fiduciary duties under ERISA. The parties have filed cross motions for summary judgment. For the reasons stated hereinafter, the defendants' motion is granted, and the plaintiff's motion is denied.

**I.**

SBC provides eligible participants short-term disability (STD) benefits and LTD benefits through the SBC Disability Income Plan (the "Plan"). The Plan defines STD as the inability of an employee "to perform all the essential functions of his job or another available job assigned by" his employer for a period lasting 52 weeks or less. (AR 602-603) LTD is defined as the period following the 52 weeks of STD where an employee is "prevented from engaging in any employment for which the Employee is qualified or may reasonably become qualified based on education, training, or experience . . . ." *Id*. The Plan states, "Employees shall provide the Claims Administrator, the Plan Administrator, and/or the Participating Company with such information and

evidence, and shall sign such documents, as reasonably may be requested from time to time, for the purpose of Administration of the Plan." (AR 616)  The Plan provides for appeals as follows:

> If your claim is denied or treated as denied, and you disagree with the decision, you may appeal the decision by filing a written request for review.  You or someone authorized by you must make the request for review within 180 days of receipt of the denial notice or, if no notice is received, 180 days after the expiration of 45, 75 or 105 days, whichever is applicable.  A written request for review should be sent directly to the appropriate named fiduciary as provided in your denial letter or, if you received no denial letter, to:
>
> > SBC Services, Inc.
> > Disability Plan
> > c/o Executive Director –
> > Workforce Effectiveness
> > P.O. Box 29690
> > San Antonio, TX 78229

(AR 1074)

CORE, INC., served as the Claims Administrator under the Plan until March 25, 2002, at which time Sedgwick CMS became the Claims Administrator.  (AR 925-1071)  SMAART is the acronym for the SBC Medical Absence and Accommodations Resource Team that is administered by Sedgwick CMS for the purpose of making claim decisions. (AR 1071)

**II.**

Taylor was employed by SBC Communications, Inc., as a Senior Manager.  (AR 539)  In April 2001, he was diagnosed with symptomatic HIV disease and depression with anxiety. (AR 132) He applied for STD benefits and signed an authorization for release of medical information on April 18, 2001. (AR 286)  On May 2, 2001, CORE sent Taylor a letter denying Taylor STD benefits as of April 19, 2001.  (AR 285) CORE stated that it had not obtained sufficient medical information about Taylor's condition from his medical provider's office. On May 3, 2001, Dr. Thomas C. Stinnett, a

psychiatrist, provided CORE an attending provider statement indicating that Taylor had a diagnosis of major depression, recurrent. He noted that Taylor had "low energy, poor concentration, feelings of helplessness and hopelessness, inability to interact effectively with others." He prescribed a number of medications, including Prozac and Lorazepam. (AR 572-573) On May 24, 2001, Terry Jefferson, M.D., Taylor's treating physician at Health for Life Clinic, diagnosed Taylor with acute/asymptomatic HIV and depression NEC. He noted that Taylor reported "lots of fatigue." (AR 130) Taylor was approved for STD benefits for the period of April 19, 2001 through August 19, 2001. (AR 304-307) Taylor's STD benefits were terminated when he went to work for a brief period of time. (AR 304)

In January, 2002, Taylor suffered a relapse in his condition and again began receiving STD benefits, beginning February 1, 2002, and continuing until September 30, 2002, when he began receiving LTD benefits. (AR 023, 335-336) During the 52 weeks that Taylor received STD benefits, he was given notice of intent to terminate benefits on a number of occasions. For example, on February 20, 2002, CORE sent Taylor a letter stating that his benefits were denied as of February 1, 2002, because CORE did not receive sufficient medical information about Taylor's condition from his provider. (AR 280) CORE obtained information from Dr. Jefferson and on March 29, 2002, approved Taylor for STD benefits from February 1, 2002 through April 5, 2002. (AR 023, 276)

On April 8, 2002, SMAART notified Taylor that he needed to provide medical documentation within five days or his benefit payments would cease as of April 5, 2002. (AR 271) On April 15, 2002, SMAART advised Taylor that his benefits were discontinued from April 6, 2002 through his return to work date because the medical documentation from Dr. Jefferson only confirmed Taylor's disability through April 5th and no additional information had been received.

3

(AR 270) Dr. Jefferson's office sent updated information on May 1st. (AR 019, 575) The records from March 22, 2002, and April 9, 2002, indicated that Taylor had a primary diagnosis of Symptomatic HIV Disease and a secondary diagnosis of Depression NEC. (AR 576-584) On May 10, 2005, SMAART reviewed the medical information, noting that Taylor was HIV positive and suffers from depression and fatigue. (AR 018) On May 15, 2002, the case manager also spoke by telephone with Dr. Jefferson, who stated that Taylor's level of fatigue was currently severe enough to keep him from even sedentary work. (AR 015) On May 16, 2002, SMAART approved Taylor for benefits through May 25, 2002. (AR 246) Taylor was subsequently approved, on May 17, 2002, to receive benefits through June 22, 2002. (AR 244)

On June 27, 2002, SMAART sent Taylor a letter notifying him that his disability benefits would be discontinued from June 23, 2002, because no additional information had been received to support continued disability benefits beyond June 22nd. (AR 238) Dr. Jefferson provided documentation on July 11, 2002, which included a June 24th progress note and lab results.

By letter dated July 29, 2002, SMAART again notified Taylor that his benefits would be discontinued effective June 23, 2002. It noted that the SMAART psychiatric physician reviewed the medical information and concluded that it did not support the presence of a severe mental impairment related to Taylor's diagnosis of depression. SMAART concluded that the clinical information did not show that Taylor's condition was so severe as to support his inability to perform his occupation as a Senior Manager from June 23, 2002, through his return to work. (AR 232) Dr. Jefferson sent additional information to SMAART that was reviewed on August 1, 2002. The denial of benefits was reversed on August 6, 2002, and he was approved for STD through September 29, 2002. (AR 0002-0004)

On August 13, 2002, SMAART set up an LTD claim for Taylor and sent him a letter advising him that he needed to apply for LTD benefits as his STD benefits would be expiring. (AR 592-594) Between August 22, 2002, and September 25, 2002, a SMAART case manager placed seven telephone calls to Taylor requesting that he call, sent two letters to Taylor requesting that he call, and sent two LTD packages to Taylor with letters advising him that the LTD application had to be returned before he could be considered for LTD benefits. (AR 333-342)

By letter dated September 20, 2002, SMAART notified Taylor that he had been approved for LTD benefits at the rate of $3,106.80 per month. The letter advised Taylor that he needed to return the LTD paperwork sent him on August 13, 2002, in order to receive payments. (AR 543)

On September 25, 2002, Taylor telephoned the SMAART case manager. According to the case manager's notes, Taylor stated he had received the LTD paperwork and letters "but had shut himself off from the rest of the world and would not reply to anyone about his status." (AR 332) He also stated "that his condition is unpredictable and on any given day he can be so fatigued that he could be stuck in bed and unable to do anything. He reported that occasionally he will be stuck in bed for a couple weeks at a time." (AR 333)

On September 30, 2002, SMAART notified Taylor that his LTD benefits had been adjusted to the rate of $9,708.92 per month. (AR 540) On October 7, 2002, SMAART sent a confirmation that Taylor's application for LTD benefits had been received and that he would be contacted soon by an LTD case manager. (AR 536) Taylor was notified by letter dated December 19, 2002, that his benefits would be reduced to $7,742.92 per month based on an estimation of Social Security benefits. (AR 527, 530)

On March 28, 2003, a SMAART representative attempted to contact Taylor by telephone to notify him that SMAART needed updated medical information. (AR 326) Taylor did not answer the telephone and the SMAART representative left a message on Taylor's voice mail. Taylor returned the call, but his case manager had left for the day. (AR 326) In an April 1, 2003, telephone conversation, Taylor told the SMAART case manager that he was still being treated by Dr. Jefferson. (AR 325) A medical authorization was sent to Taylor on April 2, 2003. (AR 325)

On April 23, 2003, a SMAART case manager called Taylor's home concerning the medical authorization which it had not received. The case manager's note states:

> 1:32PM Called to speak with Clmt. Clmt was at the doctor's office. Spoke to Garrett, Clmt's very good friend. Garrett stated that he knew the forms we were looking for, but Clmt was unable to fill them out. Forms were delivered when they were not at home, and they were soaking wet; they have been unable to fill them out. Clmt is currently at the doctor's office having bloodwork done. Asked Garrett to have Clmt call me when he returns. Gave name, #, and extension.

SMAART mailed new forms to Taylor that day. (AR 325)

On May 13, 2003, when Taylor neither returned a telephone call to SMAART nor returned the information requested, the case manager attempted to contact Taylor. (AR 324) The case manager left a voice message for Taylor requesting that he call. Additionally, the SMAART case manager mailed Taylor another package containing the medical authorization and the questionnaire for additional medical information, and she mailed a request to Dr. Jefferson asking for additional medical information, using the September 2002 release Taylor had signed. (AR. 324, 522-523)

On May 29, 2003, SMAART received notification from Dr. Jefferson's office that they were unable to provide the information requested without first receiving an updated medical authorization from Taylor. (AR 324) The case manager telephoned Taylor, who did not answer. She left a voice

message stating that an updated medical authorization was needed and that unless the authorization was received by June 2nd, Taylor was "facing suspension or termination of benefits." The case manager asked Taylor to telephone her. (AR 324)

On June 3, 2003, SMAART sent Taylor a letter informing him that his LTD benefits were being suspended pending receipt of additional information from him. (AR 323, 520) The letter set out the different attempts SMAART had made to contact Taylor and advised him that he needed to provide a signed and updated medical authorization, a signed and completed disability questionnaire, and updated medical information dating from November 2002 to the present. Taylor was informed that if SMAART did not receive the information by June 23, 2003, his claim for disability benefits would be terminated. (AR 520)

On June 25, 2003, SMAART sent Taylor a letter stating that it had been notified that Taylor was receiving disability pension benefits, which had resulted in an overpayment of LTD benefits. SMAART notified Taylor that his LTD monthly benefits would be reduced to $6,777.64 retroactive to September 30, 2002, and that he had been overpaid $13,717.95 for which he needed to reimburse SBC. The letter also stated: "Please note that your benefits have currently been terminated, due to lack of ongoing information on your claim. Enclosed is a letter detailing the termination of your benefits." (AR 516-517)

A letter was not enclosed; rather, another letter was sent on June 27, 2003. That letter informed Taylor that his claim for LTD benefits had been denied because of his failure to provide current medical information to substantiate that he had an illness or injury preventing him from engaging in any occupation. (AR 513-514) The letter also informed Taylor that he had the right to appeal the denial by submitting a written request for reconsideration within 180 days after he

7

received notice of denial of his claim. He was further informed that he was required to exhaust his appeal process prior to filing suit under ERISA. (AR 513-514)

The letter was sent by certified mail and by regular mail. (AR 317) On August 4, 2003, the certified mail receipt was returned as unclaimed. (AR 315-316)

On July 7, 2003, Taylor telephoned SMAART concerned that "something was wrong" because his house payment had not been paid. The note of the SMAART case manager states:

> 4:00PM Rec'd call from Clmt. He was calling because he got a call that his house payment did not happen. This made him realize something was wrong. Then he spoke with his partner, Garreth, who laid out the LTD paperwork for him, so he was calling to figure out what he needs to do. Explained claim is currently denied, so the best course of action is to complete the appeal packet & send it in with all available medical. Advised that we had attempted to contact him multiple times. Clmt stated that he was told we called "a couple of times." Clmt stated he has not been feeling well. More than the HIV, the medications he takes make him unable to work. Clmt explained this is a situation that is not going to change. Clmt also expressed concern about his health benefits; the labwork he needs done is $1200/month and the medication is $1700/month. Gave him the # for SBC Connect so he can find out about his health benefits. Clmt asked if he could have us talk to his partner Garreth, because he usually handles things for him. Advised that it is common for people to involve their spouses or significant others to help them sort things out. I'd be happy to speak w/Garreth re: situation, but we would also still need to speak with Clmt re: some things.
>
> Clmt called back to say that there seems to be a page missing from the green appeal form included with his denial letter. I checked w/my supervisor and advised Clmt that there is one more line that did not copy. We will get a corrected version out to him. In the meantime, the most important thing is the form on the last page of the appeal packet--and any medical info he can send in w/his appeal. Clmt stated he is thinking of getting his attorney Bill Watt involved. Clmt stated he would call his doctor tomorrow morning & then call me back.

On July 28, 2003, the case manager noted in the case file that Taylor "indicated he is appealing, but no appeal has been rec'd thus far. Will wait an additional 30 days before closing claim & deleting database." (AR 316-17)

8

On December 4, 2003, Taylor called SMAART. He stated that "he has dropped out of society and life," and that he had "fired and rehired his doctor." He said he had not been paid in many months; that he was on the verge of going bankrupt; that he needed to start taking care of matters; and that he was working with his attorney and wanted to know what he could do to get his LTD benefits reinstated. The case manager stated that she would send a copy of the appeal paperwork via facsimile. She advised Taylor that his appeal should include as much medical information as possible. (AR 315) According to a case file note on December 23, 2003, the appeal packet was successfully faxed to Taylor on December 4th. (AR 315)

On January 23, 2004, Taylor's mother, Billye Ervin, contacted the SMAART case manager. Ervin told the case manager that Taylor had told her that the appeal paperwork had been filed and benefits had been reinstated. The case manager told Ervin that she had not received any information with regard to an appeal and that SMAART did not have any medical information beyond July 2002. The case manager told Ervin that Taylor had been provided with appeal paperwork multiple times and that she had sent out another copy the day before (January 22nd). The case manager advised Ervin that she could send a copy of the appeal paperwork to Taylor's counsel in order to facilitate the appeal and that she "would be happy to review any medical [received], but at this point there is no way to reinstate benefits without any information." The case manager advised Ervin that she should talk to "her son and get the advice or assistance of a lawyer." (AR 313)

Taylor called SMAART on January 28, 2004, and the case manager spoke with him at length. Taylor stated that he was going to fax his most recent office visit with his doctor. The case manager told Taylor that the most recent office visit most likely would not reverse a denial as there was no medical information from August 1, 2002, to the present. She advised Taylor that his best option

9

was to file an appeal. She reiterated to Taylor that he had been told on July 3rd and December 4th[1] to file an appeal and submit as much medical information as possible. She told Taylor that she would look at any additional medical information she received and consult with her supervisor. (AR 312-313)

With the assistance of Sarah Mosely, CEO of Telcoe Credit union, Taylor had his medical records sent to SMAART on January 29, 2004, for delivery on January 30th. (AR 312) On February 20, 2004, the SMAART case manager returned the material to Taylor with a letter stating that his claim could not be considered for an appeal as the medical documentation had been received after the appeal period expired. (AR 511)

On June 22, 2004, SMAART received a letter from Taylor's attorney requesting information. Taylor's counsel wrote SMAART on June 17, 2005, requesting reconsideration of the termination of benefits, and included affidavits of Taylor, Ervin, and Mosely along with medical records. SMAART appears not to have taken any action on Taylor's request. Taylor commenced this action on September 20, 2005.

### III.

Defendants assert that Taylor's claim should be dismissed for failure to exhaust administrative remedies. Exhaustion of administrative remedies is a threshold legal issue to be decided by the Court *de novo*. *Kinkead v. Sw. Bell Corp. Sickness & Accident Disability Benefit Plan*, 111 F.3d 67, 68 (8th Cir. 1997). While ERISA does not contain an express requirement that employees exhaust contractual remedies prior to bringing suit, the Eighth Circuit has held that

---

[1] The case manager's notes list December 3rd, instead of December 4th. The Court assumes that was a typographical error.

exhaustion of contractual procedures is a prerequisite to bringing a suit for wrongful denial. *Wert v. Liberty Life Assurance Co. of Boston, Inc.*, 447 F.3d 1060, 1063 (8th Cir. 2006).

Defendants rely on *Wert* as support that Taylor's claim must be dismissed for failure to exhaust the review procedures. In that case, after the administrator informed Wert that she was no longer eligible for continuing benefits and that she could request a review of that decision, she elected not to pursue the review but instead commenced an action in federal court. *Id*. at 1062. Because she did not appeal, she had not exhausted her contractual remedies, and summary judgment in favor of the plan administrator was affirmed on that basis. *Id*. at 1066. Here, Taylor attempted to appeal, albeit not in the time required by the Plan. Thus, the issue here is whether an appeal denied as untimely exhausts the claimant's contractual remedies.

The Fourth Circuit held that a claimant whose appeal was untimely had failed to exhaust her plan remedies and affirmed a dismissal with prejudice in *Gayle v. United Parcel Service, Inc.*, 401 F.3d 222 (4th Cir. 2005). On the other hand, the Eighth Circuit has said in dicta that an untimely appeal "may have been sufficient to meet the exhaustion requirement." *Abdel v. U.S. Bancorp*, 457 F.3d 877, 881 (8th Cir. 2006). Because it is unclear whether the Eighth Circuit would hold that an untimely appeal meets the exhaustion requirement, and because a review of the plan administrator's decisions in this case arrives at the same result as holding that this suit is barred because Taylor failed to exhaust the Plan remedies, the Court will review the decisions that Taylor asks the Court to review.

The first step is to determine the appropriate standard for review of a denial of benefits under ERISA. In general, where a plan gives the administrator "discretionary authority to determine eligibility for benefits," the Court reviews the administrator's decision for an abuse of discretion.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). Here, the Plan provides SMAART, a team administered by Sedgwick CMS, the Claims Administrator for the Plan, with discretionary authority to determine eligibility for benefits. Under the abuse of discretion standard, the administrator's decision will be upheld if it is reasonable, that is supported by substantial evidence. *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001). "While the administrator's decision need not be supported by a preponderance of the evidence, there must be 'more than a scintilla.'" *House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001) (citation omitted).

Taylor does not dispute that the Plan grants discretionary authority to the Claims Administrator to determine his eligibility for benefits. He asserts, however, that the case should be reviewed under a less deferential standard because of a "palpable conflict of interest or a serious procedural irregularity . . . which . . . caused a serious breach of the plan administrator's fiduciary duty to [him]." *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998). A conflict or procedural irregularity sufficient to cause the court to use a less deferential standard must have "some connection to the substantive decision reached." *Id.* at 1161 (internal quotation marks omitted). "A claimant must offer evidence that gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim for us to apply the less deferential standard." *Heaser v. Toro Co.*, 247 F.3d 826, 833 (8th Cir. 2001) (internal quotation marks omitted). The Eighth Circuit has established a "sliding scale" approach in reviewing the administrator's decision should a plaintiff establish that he or she is entitled to a less deferential review. Under this approach, the "evidence supporting the plan administrator's decision must

increase in proportion to the seriousness of the conflict or procedural irregularity." *Woo*, 144 F.3d at 1162.

Taylor first contends that SBC has a financial conflict of interest because it is both the Plan Administrator and Insurer in the case. The defendants disagree. The decision to terminate Taylor's LTD benefits was made by SMAART, a team administered by Sedgwick CMS, which is the Claims Administrator for the Plan. Sedgwick CMS is a third party administrator who has no affiliation with SBC and who receives no direct financial benefit by denying claims. Taylor does not challenge defendants' characterization of the relationship. Thus, Taylor's contention of a financial conflict of interest is without merit.

Taylor next argues that SMAART breached its fiduciary duty when (1) it ignored the great weight of medical evidence it had of Taylor's disability; (2) it ignored Taylor's statements that he was not capable of functioning and needed assistance; (3) it did not communicate to Taylor that he needed to provide additional medical evidence of his depression; (4) it failed to accept Taylor's oral request to appeal; and (5) it misled Taylor into believing that his appeal would be considered after the 180 days.

In *Chronister v. Baptist Health*, 442 F.3d 648 (8th Cir. 2006), the court explained that the mere presence of a procedural irregularity is not enough to strip a plan administrator of the deferential standard. *Id.* at 655 (citing *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir. 2000)). The court held that a procedural irregularity sufficient to strip a plan administrator of the deferential standard of review must be one that gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim. *Id.* When irregularities are not so egregious as to trigger a total lack of faith in the integrity of the decision-

making process, the plan administrator is not stripped of the deferential standard of review. *Id.* (citing *Layes v. Mead Corp.*, 132 F.3d 1246, 1251 (8th Cir. 1998)).

Here, SMAART committed no procedural irregularities so serious as to give rise to serious doubts as to whether the decision reached was the product of an arbitrary decision or SMAART's whim. The record shows that SMAART received medical information from Dr. Jefferson in July 2002 but did not receive additional medical information until January 2004. In the spring of 2003, SMAART attempted to contact Taylor by telephone on at least three occasions to obtain updated medical information. SMAART wrote a letter to him on June 3, 2003, stating the need for updated medical information. When Taylor did not respond, SMAART send him a letter terminating his benefits. That letter, dated June 27, 2003, informed him that he had 180 days from the date he received the letter in which to appeal the termination of benefits by submitting a written letter requesting reconsideration. The letter was sent by certified mail and by regular mail. The letter sent by certified mail was returned as unclaimed, but it is undisputed that Taylor received the letter, because on July 7, 2003, he spoke to a representative of SMAART and stated that a page appeared to be missing from the green appeal form included with the letter. The record shows that the case manager told Taylor that she would send a corrected version to him, but in the meantime he should complete the form he had and send it in with any additional information. He did not complete the form and send it in, nor did he provide any additional information. On July 28, 2003, Taylor told SMAART that he would be appealing, but he still did not send the written request for reconsideration. Nothing happened until December 4, 2003, when Taylor called SMAART and asked that a copy of the appeal information be faxed to him. A copy of the appeal paperwork was sent to him by facsimile that day.

The appeal time expired either the last week in December or the first week in January, depending on what assumptions are made as to the date that Taylor received the letter terminating his benefits and advising him of his right to appeal.[2]  In late January, after the appeal time had expired, the case manager made comments to Taylor and his mother suggesting that an appeal could still be considered.  However, by that time, the time for appeal had already expired.  Nothing that was said in late January caused Taylor to miss the deadline for filing an appeal.

Other than statements made in late January of 2004 suggesting that Taylor could still file an appeal, nothing happened that amounts to a procedural irregularity.  It is not true that SMAART ignored medical evidence.  SMAART made diligent efforts to obtain current medical evidence in the spring and summer of 2003, but Taylor did not cooperate.  SMAART did not ignore Taylor's statements that he was incapable of functioning and needed assistance.  On July 7, 2003, the case manager told Taylor that she would be happy to speak with "his partner, Garreth,[3]" because "it is common for people to involve their spouses or significant others to help them sort things out."  She told Taylor that she would still need to talk to him (Taylor) about some things, but she did not refuse to talk with any friend or relative whom Taylor asked to help with his claim.  No friend or relative of Taylor communicated on his behalf with SMAART from July 7, 2003, when the case manager stated that she would be happy to speak with such a person, until January 23, 2004, when Taylor's mother called SMAART.  It may be that Taylor needed help, but it was up to Taylor to obtain the help that he needed.  On December 4, 2003, more than three weeks before the appeal deadline,

---

[2] SMAART calculated the deadline as December 28, 2003, which assumes that the June 27, 2003, denial letter was received by Taylor five days after it was mailed.  (AR 511)

[3] The record does not state Garreth's full name.  In another place, he is identified as Garrett.

15

Taylor told SMAART that he was working with an attorney to get his benefits reinstated, but still no appeal was filed.

It is not true that SMAART failed to communicate to Taylor that he needed to provide additional medical evidence of his depression. As noted above, in the spring and early summer of 2003, SMAART repeatedly requested updated medical information, and Taylor was on notice that he needed to provide information regarding his current medical condition, including his depression.

Taylor did not make an oral request to appeal. The record says that he stated that he would be filing an appeal, but nothing in the record says that he requested that the requirement of a written request for review be waived; nor does anything in the record show that, if SMAART had decided not to waive the requirement of a written request for review, that decision would be the kind of procedural irregularity that would, according to *Chronister*, justify depriving a plan administrator of the deferential standard of review. Finally, as noted above, the only comments that suggested that SMAART would accept a late appeal were made after the deadline had passed. Those were not comments upon which Taylor could have relied in missing the deadline.

In summary, SMAART committed no procedural irregularities that give rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim. It is not apparent that there were any procedural irregularities at all, other than the suggestion in late January of 2004 that SMAART might still accept an appeal. There were no procedural irregularities so egregious as to trigger a total lack of faith in the integrity of the decision-making process. Hence, SMAART's decisions may be reversed only to see whether SMAART abused its discretion.

The Plan provides that benefits may be discontinued if a recipient of benefits does not provide medical information. SMAART did not abuse its discretion in requesting medical information in the spring of 2003. When Taylor failed to respond after several attempts on the part of SMAART, SMAART did not abuse its discretion in terminating his benefits for failure to supply current information about his condition. The letter that SMAART sent to Taylor notified him that if he wished to appeal the decision, he or his authorized representative could submit a written request for reconsideration within 180 days after he received the notice of the denial of the claim. Taylor did not submit a written request for reconsideration within 180 days. SMAART did not abuse its discretion in refusing to consider an appeal or request for reconsideration submitted after the 180-day time period had expired.

The result here is ultimately the same as barring review for failure to exhaust administrative remedies, and the reasoning is much the same. *Cf. Goewert v. Hartford Life & Accident Ins. Co.*, 442 F. Supp. 2d 724, 727, 730 (E.D. Mo. 2006) (stating that the court was not deciding whether to deny the claim for failure to exhaust remedies but was reviewing Hartford's denial of benefits for failure to appeal in a timely manner; but then holding that failure to file a timely appeal is one way of failing to exhaust administrative remedies). SMAART refused to accept Taylor's appeal because it was untimely. The record establishes beyond doubt that Taylor's appeal was untimely. SMAART did not abuse its discretion.

## CONCLUSION

This is a harsh result because it may well be that Taylor would have qualified for a continuation of long-term disability benefits had he submitted timely medical information during April, May, or June of 2003, or had he submitted a timely request for reconsideration in the last six

17

months of 2003. He did neither. It may be that his depression and fatigue caused or contributed to his failure to comply with the requirements of the Plan, but that issue is not before the Court. The issues before the Court are whether SMAART committed some procedural irregularity that results in a less deferential standard of review, and, if not, whether the plan administrator abused its discretion in denying benefits. SMAART did not commit a procedural irregularity that would justify a less deferential standard of review, nor did SMAART abuse its discretion in terminating benefits when Taylor failed to provide current medical information after repeated requests that he do so, nor did SMAART abuse its discretion in declining to accept an untimely appeal. SMAART complied with the Plan at every step. This Court could reverse only if it had authority to modify the Plan. "Plan sponsors, not the federal courts, are empowered by ERISA 'to adopt, modify, or terminate welfare plans.'" *Gayle*, 401 F.3d at 228 (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S. Ct. 1223, 131 L. Ed. 2d 94 (1995)). Accordingly, the decision of SMAART is affirmed. Defendants' motion for summary judgment is GRANTED. Plaintiff's motion for summary judgment is DENIED.

DATED this 25th day of May, 2007.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE